IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| FLEMING COMPANIES, INC., et al., ) | |
| ) | Case No. 03-10945-MFW |
| Debtors. ) | |
| ) | |
| ──────────────────────────────── ) | |
| ) | |
| AWG ACQUISITION, LLC, et al., ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | Civ. No. 04-371-SLR |
| ) | |
| FLEMING COMPANIES, INC. and ) | |
| ALBERTSON'S INC., ) | |
| ) | |
| Appellees. ) | |

**O R D E R**

At Wilmington this 30th day of March, 2005, having reviewed the appeal filed by AWG Acquisition, LLC, and the papers filed in connection therewith;

IT IS ORDERED that said appeal is denied and the decision of the bankruptcy court dated February 27, 2004 is affirmed, for the reasons that follow.

1. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999). With mixed

questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. In re Hechinger, 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

2. **Question presented.** Did the bankruptcy court err when it denied the debtors' motion to assume and assign the Tulsa Facility Standby Agreement ("Tulsa FSA")?

3. **Background facts.** In July 2003, debtors at bar sold their wholesale grocery distribution business assets to C&S Wholesale Grocers, Inc. and C&S Acquisition LLC (collectively, "C&S"). Pursuant to the sale, C&S was permitted to designate another purchaser for certain assets. C&S designated AWG as the purchaser of the Tulsa FSA. In September 2003, the debtors filed a motion to assume and assign the Tulsa FSA to AWG. Albertson's Inc., a customer of debtors and a party to the Tulsa FSA,

objected.

4. By the Tulsa FSA, debtors committed to "supply to Albertson's a certain amount of food, grocery, and related products". Debtors committed to do so through "certain resources, including capital, employees, inventory, equipment, and facilities".[1]  (D.I. 14, ex. 1, ¶ (iv))  Specifically, debtors committed to supply "food, grocery, meat, perishables and other related products, supplies and merchandise . . . as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement **from the Tulsa Facility**."  (D.I. 14, ex. 1, ¶ 1)(emphasis added)  Moreover, the products sold to Albertson's pursuant to the Tulsa FSA were to be "priced, and other terms of sale [were to] be established, in accordance with the Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied **by the Tulsa Facility**".  (D.I. 14, ex. 1, ¶ 2)(emphasis added)  The term of the Tulsa FSA was to continue "until the later of (i) five (5) years following the Effective Date; or (ii) the date upon which Albertson's has purchased one billion one hundred fifty five million dollars ($1,155,000,000) of Products **from the Tulsa Facility**".  (D.I. 14,

---

[1] By a concurrent transaction, debtors acquired Albertson's Tulsa, Oklahoma warehouse, designated as "the Tulsa Facility". (D.I. 14, ex. 1, ¶ (iii))

ex. 1, ¶ 4)  The "Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied by Tulsa" ("the Plan") was attached to the Tulsa FSA as Exhibit B.  Attachment A to the Plan set forth the charges associated with the Plan.  The "Fixed Charge" included property rent and property tax payable by debtors for the Tulsa Facility.  (D.I. 14, ex. 1)

    5.  **Analysis.**  As correctly noted by the bankruptcy court, once a debtor has established a sound business reason to assume an executory contract, the debtor must comply with the requirements of 11 U.S.C. § 365.  Among those requirements is that the debtor provide adequate assurance of future performance.  See 11 U.S.C. §§ 365(b)(1)(A) and (f)(2)(A).  Determining whether a debtor has provided adequate assurance is a fact-based inquiry that focuses on the specific facts of the proposed assignment.  See Cinicola v. Scharffenberger, 248 F.3d 110 (3d Cir. 2001).

    6.  The bankruptcy court, therefore, started with the premise that a contract must be assigned and enforced according to its terms.  See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001).  The court determined, through its fact-based inquiry, that use of the Tulsa Facility was an essential provision of the Tulsa FSA.  The court then reasoned that AWG, which had directed the debtors to reject the Tulsa Facility lease, could not fulfill the express requirements of the Tulsa FSA.  The court concluded that

4

permitting permit AWG to supply Albertson's through its own channels of supply would impermissibly modify the terms of the Tulsa FSA.

7.  I see no error in this reasoning.[2]

_____
United States District Judge

---

[2] I note, as did the bankruptcy court, that Oklahoma law (the law governing the Tulsa FSA) is consistent with this reasoning, as it provides:
>   (1) Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

12A Okla.St.Ann. § 2-614(1). The annotation to this statute explains that "Oklahoma has previously been very strict in holding that the parties are bound by the terms of the agreement." Therefore, "[t]here must . . . be a true commercial impracticability to excuse the agreed to performance and justify a substituted performance." Here, the agreed to facility is not available only because debtors, a party to the Tulsa FSA, made the Tulsa Facility unavailable by rejecting the lease. I agree with the bankruptcy court that these circumstances do not justify the substituted performance requested by debtors.