**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-2365
_____

IN RE: FLEMING COMPANIES, INC., ET AL.,

Debtors,

AWG ACQUISITION LLC;
ASSOCIATED WHOLESALE GROCERS, INC.,

Appellants

_____

On Appeal From the United States District Court
for the District of Delaware
(No. 04-cv-00371)
District Judge: Honorable Sue L. Robinson, Chief Judge

Argued: December 12, 2006

Before: FISHER, CHAGARES, *Circuit Judges,* and
BUCKWALTER,[*] *Senior District Judge*.

(Filed August 22, 2007)
_____

---

[*] The Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Mark T. Benedict, Esq. (Argued)
Leonard L. Wagner, Esq.
Eric J. Howe, Esq.
Husch & Eppenberger, LLC
1200 Main Street, Suite 2300
Kansas City, MO 64105

Selinda A. Melnik, Esq.
Denise Kraft, Esq.
Edwards Angell Palmer & Dodge, LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801

Counsel for Appellants

Richard A. Chesley, Esq. (Argued)
Daniel B. Prieto, Esq.
Michelle L. Dama, Esq.
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, IL 60601

Daniel J. DeFranceschi, Esq.
Kimberly D. Newmarch, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Counsel for Appellee

_____

OPINION OF THE COURT
_____

CHAGARES, *Circuit Judge*:

This appeal arises out of a bankruptcy involving grocery wholesalers and retailers in the Oklahoma marketplace. The

Bankruptcy Court denied a motion for assumption and assignment of an executory contract in favor of Albertson's, Inc. (Albertson's), the nondebtor contracting party. The Bankruptcy Court determined that the proposed assignee, appellants AWG Acquisition LLC and Associated Wholesale Grocers, Inc., (collectively, AWG), could not provide adequate assurance of future performance of the contract because an essential term of the contract could not be fulfilled. The District Court affirmed.

We are called upon to decide the narrow question of whether a term relating to the use of a specific facility is material and economically significant to a contract and, if it is, whether AWG's undisputed inability to fulfill the term prevented the assumption and assignment of that contract under § 365(f) of the Bankruptcy Code, 11 U.S.C. § 365. We will affirm.

I.

The debtor, Fleming Companies, Inc. (Fleming), is a wholesale supplier of grocery products to supermarkets. Albertson's, a supermarket chain, operates more than 2,300 retail grocery stores in the United States. In most cases, Albertson's stores are supplied by warehouse distribution centers that Albertson's owns and operates. In Oklahoma, for example, Albertson's constructed a large distribution facility (the "Tulsa Facility") to supply its stores throughout the Midwest, including those in Oklahoma. After operating at only 60% capacity, however, Albertson's decided to sell the Tulsa Facility. In 2002, Fleming purchased the Tulsa Facility as part of an integrated transaction for approximately $78 million in cash. In return, Fleming received the warehouse, the inventory in the warehouse, and Albertson's agreement to a long-term supply arrangement for its Oklahoma and Nebraska stores.

The supply arrangement was embodied in two independent written contracts executed on June 28, 2002: the Lincoln Facility Standby Agreement (Lincoln FSA) and the Tulsa Facility Standby Agreement (Tulsa FSA). The FSAs set forth the terms and conditions under which Albertson's agreed to purchase groceries and supermarket products from Fleming for its twenty-eight Oklahoma and eleven Nebraska grocery stores. Although the two

agreements were nearly identical, Section 1 differed in one important respect pertinent to this appeal. Section 1 of the Lincoln FSA stated:

> Section 1: Fleming's Commitment to Supply
>
> Throughout the Term (as defined below) of this Agreement, Fleming will maintain capital, employees, inventory, equipment, and facilities sufficient to supply food, grocery, meat, perishables and other related products, supplies and merchandise ("Products") as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement.

Appendix (App.) 806. In contrast, Section 1 of the Tulsa FSA read:

> Section 1: Fleming's Commitment to Supply
>
> Throughout the Term (as defined below) of this Agreement, Fleming will maintain capital, employees, inventory, equipment, and facilities sufficient to supply food, grocery, meat, perishables and other related products, supplies and merchandise ("Products") as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement *from the Tulsa Facility.*

App. 836 (emphasis added.)

According to Albertson's, the Tulsa Facility was a key

element in the bargain between Albertson's and Fleming. The Tulsa FSA emphasized the importance of a supply of products "from the Tulsa Facility" because the Tulsa Facility contained not only many of its former employees but also the infrastructure created by Albertson's. This allowed Albertson's to continue using its electronic ordering systems and ordering codes for the products supplied under the Tulsa Agreement. The electronic ordering system in place at the Tulsa Facility permitted Albertson's to gather data which it then used to make marketing and pricing decisions. At the time of the agreement, Albertson's envisioned, and the contract reflects, a seamless supply of products to Albertson's stores. In other words, the parties contracted to limit the economic damage of any disruption in service, recognizing the critical importance of consistency in the competitive grocery industry.

Fleming and Albertson's operated under the FSAs for less than one year before Fleming filed for bankruptcy on April 1, 2003. Throughout that time, Fleming was unable to meet the required service levels. The Tulsa FSA obligated Fleming to maintain a service level of 96% on each category of product, or otherwise be in material breach of the agreement. There were eight categories of products: (1) warehouse grocery; (2) dairy; (3) frozen food products; (4) produce; (5) meat; (6) bakery; (7) deli; and (8) grocery, dairy and frozen warehouse supplies. Within these broad categories, Fleming supplied more than 2,500 private label products to Albertson's stores. On Albertson's part, the Tulsa FSA required Albertson's to pay Fleming a fixed weekly payment of $210,113 to help Fleming defray the costs of running the Tulsa Facility.

By August 2003, Albertson's stopped ordering grocery products from Fleming and stopped paying the weekly charge. Albertson's switched its source of supply for the Oklahoma market from the Tulsa Facility to its own warehouse in Fort Worth, Texas.

On August 15, 2003, the Bankruptcy Court entered an Order approving the sale of Fleming's assets to C&S Wholesale Grocers, Inc. and C&S Acquisition LLC (collectively, C&S). The Order authorized C&S to designate third-party purchasers for certain assets, included among them the right to acquire Fleming's

executory contracts with Albertson's. C&S designated AWG. AWG is a cooperative of independent grocery wholesalers operating in the Midwest from distribution centers in Kansas City, Missouri; Oklahoma City, Oklahoma; Springfield, Missouri; and Ft. Scott, Kansas. In addition, AWG operates retail supermarkets in Tulsa and Oklahoma City through a wholly-owned subsidiary called Homeland Stores, Inc. (Homeland). In some places, Homeland markets are located directly across the street from Albertson's stores. Homeland carries similar products.

On August 23, 2003, Fleming closed the Tulsa Facility and the Lincoln Facility. At about the same time, Fleming rejected its lease for the Tulsa Facility at the direction of AWG. The Bankruptcy Court approved the rejection on September 17, 2003.

On September 3, 2003, Fleming filed a motion to assume and assign the Lincoln FSA and the Tulsa FSA to AWG pursuant to 11 U.S.C. § 365. AWG proposed to supply Albertson's Oklahoma stores from AWG's Oklahoma City distribution center and to supply Albertson's Nebraska stores from AWG's Kansas City warehouse. Albertson's opposed the motion for a variety of reasons, among them that AWG's electronic ordering, billing and inventory systems were not compatible with Albertson's and switching to AWG's system would have been costly and inefficient for Albertson's. According to Albertson's, AWG's deliberate decision *not* to acquire the Tulsa Facility created a real and cognizable economic detriment that contravened the essence of the contract embodied in the term "supply . . . from the Tulsa Facility."

The Bankruptcy Court conducted a hearing on the motion for assumption and assignment.[1] At the hearing, AWG's representatives testified that it was capable of fully performing both

---

[1] Albertson's filed a cure claim against Fleming as a result of Fleming's purported material breaches of the Tulsa and Lincoln FSAs. However, at a hearing before the Bankruptcy Court on December 4, 2003, Albertson's voluntarily withdrew the cure claim with prejudice and agreed to proceed solely on the issue of whether, as a matter of law, the Tulsa and Lincoln FSAs could be assumed and assigned.

the Tulsa FSA and the Lincoln FSA: Albertson's would be able to purchase its products from AWG at the same price and on the same terms that Albertson's expected to receive from Fleming, pursuant to the FSAs, including freight charges.

The Bankruptcy Court granted Fleming's assumption motion as to the Lincoln FSA, but denied the motion as to the Tulsa FSA. The decision regarding the Lincoln FSA is not the subject of this appeal. As for the Tulsa FSA, the Bankruptcy Court held that "fulfillment from the Tulsa Facility is an essential element of the agreement." App. 9. On motion for reconsideration, the Bankruptcy Court reiterated "that shipment from the Tulsa Facility was a material term of the Tulsa Agreement and that adequate assurance of performance of that term had not been proven." App. 18. Fleming and AWG appealed.

The District Court affirmed the decision to deny Fleming's motion for assumption and assignment of the Tulsa FSA. The District Court found no error in the Bankruptcy Court's conclusion that "use of the Tulsa Facility was an essential provision of the Tulsa FSA." App. 47. The District Court also upheld the Bankruptcy Court's determination that "AWG, which had directed the debtors to reject the Tulsa Facility lease, could not fulfill the express requirements of the Tulsa FSA." Id. Thus, the District Court concluded that permitting "AWG to supply Albertson's through its own channels of supply would impermissibly modify the terms of the Tulsa FSA." App. 47-48.

This appeal followed.

II.

The Bankruptcy Court exercised jurisdiction over the underlying motion for assumption and assignment of the Tulsa FSA pursuant to 28 U.S.C. § 157(a). The District Court had subject matter jurisdiction over the appeal of the bankruptcy order under 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. § 158(d).

We review the Bankruptcy Court's findings of fact for clear error, and we exercise plenary review over its conclusions of law.

Cinicola v. Scharffenberger, 248 F.3d 110, 115 n.1 (3d Cir. 2001). "Because the district court sits as an appellate court in bankruptcy cases, our review of its decision is plenary." Id. (citing In re Lan Assocs. XI, L.P., 192 F.3d 109, 114 (3d Cir. 1999)).

III.

A.

Section 365 of the Bankruptcy Code generally permits the trustee to assume or reject any executory contract of the debtor. 11 U.S.C. § 365(a). This allows "'the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not.'" Cinicola, 248 F.3d at 119 (quoting L.R.S.C. Co. v. Rickel Home Ctrs. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000)). Upon assuming an executory contract, the trustee is likewise authorized to assign the executory contract. Section 365 provides in pertinent part:

> (f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if--
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B) *adequate assurance of future performance by the assignee* of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f) (emphasis added). The statutory requirement of

"adequate assurance of future performance by the assignee" affords "needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment." Cinicola, 248 F.3d at 120; 11 U.S.C. § 365(k). While the bankruptcy court has discretion to excise or waive a bargained-for element of a contract, "Congress has suggested that the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court . . . must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain." In re Joshua Slocum Ltd., 922 F.2d 1081, 1091 (3d Cir. 1990).

The text of § 365(f)(2)(B) employs the phrase "adequate assurance of future performance" of the contract, but that phrase is not defined in the Bankruptcy Code. As we noted in Cinicola, however, the Bankruptcy Code adopted the phrase "adequate assurance of future performance" from Uniform Commercial Code § 2-609(1), which provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance . . . ." Cinicola, 248 F.3d at 120 n.10 (quoting UCC § 2-609(1)).

It is clear that adequate assurances need not be given for every term of an executory contract. Because the bankruptcy court can excise or refuse enforcement of terms of a contract in order to permit assignment, we must determine what standard applies to evaluate whether excising "supply . . . from the Tulsa Facility" would deny Albertson's the full benefit of its bargain. In Joshua Slocum, we applied a "material and economically significant" standard to determine whether the Bankruptcy Court had the authority to excise an "average sales" clause in a lease agreement, and then assign the lease to the designated third-party assignee. We concluded there that the clause was "a material and economically significant clause in the leasehold at issue." 922 F.2d at 1092. We found that the Bankruptcy Court did not have authority to excise the relevant provision because the "particular clause [was] of financial import to the landlord in insuring occupancy by high volume sales, viable businesses, thus increasing the rent received under the percentage rent clause." Id. As a result,

9

we held that the Bankruptcy Court erred in assigning the lease without the "average sales" clause.

The "material and economically significant" standard we employed in Joshua Slocum was derived from a review of case law interpreting § 365 of the Bankruptcy Code which focused on balancing twin concerns: preventing substantial economic detriment to the nondebtor contracting party and permitting the bankruptcy estate's realization of the intrinsic value of its assets. See id. (citing In re Mr. Grocer, Inc., 77 B.R. 349, 354 (Bankr. D.N.H. 1987)); see also In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (recognizing §365's attempt "to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain. Nowhere is the tension between these interests, and the difficulty in striking the balance, more apparent than in trying to determine whether there is the requisite adequate assurance of future performance.") (quotation marks and alterations omitted).

Neither AWG nor Albertson's disputes the essence of the "material and economically significant" standard or its applicability in this context. Under AWG's understanding of Joshua Slocum, however, an assignee must only give adequate assurance of future performance of the "economically material" terms of the contract. AWG argues that shipment "from the Tulsa Facility" is not such a term given that AWG can supply groceries to Albertson's at the same price and on the same payment terms as had Fleming. According to AWG, the Tulsa Facility is merely a warehouse with nothing unique about it. Albertson's bargained to buy $1.155 billion of groceries and supermarket products (of a type and quality) for a certain price (including freight) to be timely delivered to Albertson's Oklahoma stores. As long as Albertson's receives groceries on those bargained-for terms, AWG contends, it does not matter from where those groceries are supplied. Finally, AWG argues that Albertson's failed to provide any evidence that it would suffer economic harm if supplied from AWG's Oklahoma City facility. Therefore, AWG argues that "supply . . . from the Tulsa Facility" is not an economically material term, and AWG's performance from its Oklahoma City facility should not preclude

10

assignment of the Tulsa FSA to AWG.

We disagree. AWG misconstrues the Joshua Slocum standard. The resolution of this dispute does not depend on whether a term is "economically material." Rather, the focus is rightly placed on the importance of the term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance). See Joshua Slocum, 922 F.2d at 1092 (concluding that "average sales" provision of lease which permits either landlord or tenant to terminate the lease after either three or six years if annual sales are below a certain level is "material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange"); In re E-Z Convenience Stores, Inc., 289 B.R. 45, 51-52 (Bankr. M.D.N.C. 2003) (holding that right of first refusal is a material and bargained-for element of the lease which is economically significant to nondebtor party to lease); In re New Breed Realty Enter. Inc., 278 B.R. 314, 324-25 (Bankr. E.D.N.Y. 2002) (holding breached "time is of the essence" clause is material aspect of agreement based upon agreement's unequivocal statement and state law); In re Southern Biotech, Inc., 37 B.R. 311, 317 (Bankr. M.D. Fla. 1983) (barring assumption of contract by trustee, involving sale of plasma from blood collected by inmates, where contract required that collection be conducted in accordance with "good and sound medical practice" and trustee could not provide such adequate assurance).

A "time is of the essence" clause is similar to "supply . . . from the Tulsa Facility" in the sense that it is not inherently material or obviously economic, but such a term can be integral to a contract, and certainly, delay can cause economic detriment. See New Breed, 278 B.R. at 322-25 (noting that a party's failure to perform by the date specified is a material breach of an agreement where both parties agreed to include "time is of the essence" provision in the contract). Likewise, "supply . . . from the Tulsa Facility" does not have manifest material and economic significance. However, because the Tulsa FSA arose from Fleming's acquisition of the Tulsa Facility, it is clear that the parties considered supply from that facility to be "material" in the sense that the express condition was an integral part of the

11

agreement. Moreover, not utilizing the Tulsa Facility would burden Albertson's in an "economically significant" way – that is, Albertson's would not reap the benefit of its bargain. Not only did Albertson's expect timely delivery of foodstuffs at agreed-upon prices no matter where product was purchased or shipped, but it also bargained for the benefits of expedience, of a trained staff, a consistent supply of products, and a proven electronic system of record-keeping which furthered Albertson's marketing and pricing plans, all of which were only available "from the Tulsa Facility."

Our analysis does not end here. We must also consider the rights of AWG and Fleming's creditors to get the benefit of the bargain Fleming struck with Albertson's. See Joshua Slocum, 922 F.2d at 1092. "'Adequate assurance of future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows that they were intended to be given a practical, pragmatic construction. . . . What constitutes 'adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption." Cinicola, 248 F.3d at 120 n.10 (quotation marks and alterations omitted). Here, the record reflects and our review confirms that AWG could not provide the same benefits to Albertson's as were available from Fleming, due to the fact that Fleming rejected the Tulsa Facility lease at AWG's behest. AWG has not pointed to any evidence on appeal that would lead to an opposite conclusion. On balance, considering the right of Albertson's to expect their foodstuffs to be "suppl[ied] . . . from the Tulsa Facility" and the rights of AWG and Fleming's creditors to get the benefit of a supply contract, we conclude that the scale tips in favor of Albertson's.

Accordingly, we hold that "supply . . . from the Tulsa Facility" is both a material and an economically significant term of the contract, and AWG, by its own actions, cannot give adequate assurance of performance.

B.

AWG further argues that designating "from the Tulsa Facility" as a material term effectively transforms the term into a *de facto* anti-assignment provision. The Bankruptcy Code expressly permits assignment of executory contracts even when contracts prohibit such assignment. 11 U.S.C. § 365(f)(1). Section

365(f)(1) is not limited to explicit anti-assignment provisions. Provisions which are so restrictive that they constitute *de facto* anti-assignment provisions are also rendered unenforceable. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831-32 (D. Del. 1999) (citing Joshua Slocum, 922 F.2d at 1090). Neither Albertson's nor Fleming could operate the Tulsa Facility profitably. According to AWG, reading the Tulsa FSA to require a buyer to acquire the Tulsa Facility limits the scope of potential buyers in that sale to either an existing wholesaler in the region who does not have its own distribution center or to a new entrant into the marketplace seeking to acquire both the Tulsa FSA and the distribution center. C&S, the high bidder on Fleming's assets, was unwilling to commit to taking the Tulsa Facility, in part because both Albertson's and Fleming were unable to operate the facility successfully. Therefore, AWG contends that to require shipment from the Tulsa Facility is to burden an assignee with a heavy economic obligation, thus constituting a *de facto* anti-assignment provision.

Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder. In re ANC Rental Corp., 277 B.R. 226, 238 (Bankr. D. Del. 2002). "The [debtor] . . . may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." In re Italian Cook Corp., 190 F.2d 994, 997 (3d Cir. 1951). The *cum onere* rule "prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement." United Air Lines, Inc v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.), 346 B.R. 456, 468 n.11 (Bankr. N. D. Ill. 2006).

Applying this precept to our determination above that "supply . . . from the Tulsa Facility" is a material term of the contract, we reject AWG's argument that the term operates as a *de facto* anti-assignment provision. We recognize that a fine line exists between reading a contractual term as a burdensome obligation or as a *de facto* restriction on assignment. However, we draw the line where a party refuses to accept part of the contract's obligations, and as a result it cannot perform a material bargained-for term of the contract. Here, AWG rejected the Tulsa Facility lease, and now complains that it is impossible to comply with an

integral term of the contract. This term could have been performed by some party. It is not now an anti-assignment provision simply because AWG made the decision not to take on a necessary burden. As we have previously expressed, "[a]n assignment is intended to change only who performs an obligation, not the obligation to be performed." <u>Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 60 (3d Cir. 2001) (quotation marks omitted).

## IV.

We conclude that "supply . . . from the Tulsa Facility" is a material and economically significant term which AWG cannot perform because it has rejected the lease for the Tulsa Facility. The inability to perform this aspect of the agreement precludes the assignment of the Tulsa FSA to AWG. Accordingly, we will affirm the District Court's judgment.